**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| JOHN DOE, | * | CIVIL ACTION |
| | * | |
| Plaintiff | * | NO. 17-12081 |
| | * | |
| v. | * | SECTION |
| | * | |
| TULANE UNIVERSITY, TULANE | * | COMPLAINT |
| UNIVERSITY BOARD OF TRUSTEES, J. | * | AND JURY TRIAL DEMAND |
| DAVIDSON PORTER, individually and as | * | |
| agent for TULANE UNIVERSITY, | * | |
| MEREDITH SMITH, individually and as agent | * | |
| for TULANE UNIVERSITY, VANESSA | * | |
| RODRIGUEZ, individually and as agent for | * | |
| TULANE UNIVERSITY and DAWN | * | |
| BROUSSARD, individually and as agent for | * | |
| TULANE UNIVERSITY, | * | |
| | * | |
| Defendants | * | |
| | * | |
| *    *    *    *    *    *    *    * | | |

**COMPLAINT**

Plaintiff John Doe[1], by his attorneys Nesenoff & Miltenberg, LLP and Schonekas, Evans,

McGoey & McEachin, LLC, as and for his Complaint, respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.      This case arises out of the actions taken and procedures employed by Defendants

Tulane University ("Tulane" or the "University"), J. Davidson "Dusty" Porter ("Defendant

Porter"), Meredith Smith ("Defendant Smith"), Vanessa Rodriguez ("Defendant Rodriguez") and

Dawn Broussard ("Defendant Broussard") concerning allegations made against Plaintiff, a male

freshman student at Tulane, as a result of false allegations of nonconsensual sexual contact with

fellow Tulane student Jane Doe.

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

2.      In addition to the damages sustained by John Doe, including his inability to continue his education at Tulane and a permanent notation of a finding of sexual assault on his educational records, John Doe has sustained tremendous damages to his future education and career prospects as a result of the University finding John Doe responsible for an offense he did not commit resulting in his suspension from the University. Due to the erroneous outcome and resulting sanction of suspension, John Doe lost eligibility for the $90,000 scholarship he had received and his participation in the Honors Program.  Throughout the investigative process, Defendants failed to abide by University's own guidelines and regulations and acted in direct violation of federal and/or state law.

3.      A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii) Defendants failed to provide John Doe proper notice of the charges; (iii) Defendants evidenced a gender bias against John Doe as the male accused of sexual misconduct throughout the investigative process; (iv) Defendants failed to conduct a timely investigation and adjudication process; (v) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (vi) Defendants failed to consider new material evidence presented by John Doe; (vii) Defendants failed to provide John Doe with necessary information prior to his hearing; (viii) Defendants failed to provide John Doe with a rationale for their decision; and (ix) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard, all of which demonstrated substantial procedural errors in violation of Title IX, the Fourteenth Amendment and other federal and/or state laws.

4.      When Defendants subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way, deprived him of due process and discriminated against him because of his gender. Defendants failed to adhere to Tulane's own guidelines and regulations, and the guidelines and regulations themselves were inherently discriminatory and insufficient to protect the rights of male students. The decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males and the underlying motive to protect Tulane's reputation and financial well-being was required for a conclusion of sexual misconduct to be reached.

5.      John Doe has been greatly damaged by the actions of Defendants. His education and career prospects have been severely compromised, and the significant monies spent on obtaining a college education at Tulane have been squandered. John Doe lost eligibility for a $90,000 scholarship he had earned and received from the University. Additionally, as a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

6.      John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, violation of the 14th Amendment Procedural Due Process, breach of contract and other state law causes of action.

## THE PARTIES

7.      John Doe is a natural person residing in the State of New York.  During the events described herein, John Doe was a student at Tulane and resided on the University's campus in New Orleans, Louisiana.

8.     Upon information and belief, Defendant Tulane University is a private, coeducational university located in New Orleans, Louisiana.

9.     Upon information and belief, Defendant Porter is a resident of the State of Louisiana and was the Vice President of Student Affairs at Tulane at all relevant times herein.

10.     Upon information and belief, Defendant Smith is a resident of the State of Louisiana and was the Title IX Coordinator at Tulane at all relevant times herein.

11.     Upon information and belief, Defendant Rodriguez is a resident of the State of Louisiana and was the Director of the Office of Student Conduct at Tulane at all relevant times herein.

12.     Upon information and belief, Defendant Broussard is a resident of the State of Louisiana and was the Assistant Director and Investigator of the Office of Student Conduct at Tulane at all relevant times herein.

## JURISDICTION AND VENUE

13.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution

14.     This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business within the State of Louisiana.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.   Background: The "April 2011 Dear Colleague Letter"
Of The Department of Education's Office for Civil Rights.**

16.     On April 4, 2011, the Office of Civil Rights ("OCR") in the Department of Education ("DOE" or "Ed") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter" provides a necessary set of background facts to this action.

17.     The "April 2011 Dear Colleague Letter" advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the "April 2011 Dear Colleague Letter" required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including sexual assault. Several schools, like Harvard Law School, had previously been using a "clear and convincing" standard of proof, and some, like Stanford University applied the criminal standard, "beyond a reasonable doubt."

18.     The "April 2011 Dear Colleague Letter" states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The "April 2011 Dear Colleague Letter," while not completely ignoring due process concerns, suggested that schools focus more on victim advocacy. The "April 2011 Dear Colleague Letter" states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the "April 2011 Dear Colleague Letter" was published, many schools changed their sexual assault and sexual harassment policies and procedures.

19.     The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges

and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon ("Lhamon"), former Assistant Secretary of the DOE in charge of its OCR, delivered the following directives orders to colleges and universities:

(a)   In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)   In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

(c)   In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any

college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding, "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d) Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

20. To support making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of more investigators for Title IX enforcement and has since "conducted 435 investigations of colleges for possibly mishandling reports of sexual violence." according to the Chronicle of Higher Education Title IX Tracker. As of September 10, 2017, the Federal Government has 360 open investigations at institutions of higher education. The Department of Education has negotiated settlements with many schools.

21. The colleges and universities under OCR investigation, as well as those schools not yet under investigation but which receive federal funding, including Defendant Tulane, are fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S.

Department of Justice ("DOJ"). In April 2014, the White House issued a report entitled "Not Alone," which included a warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools.  The Report further warns that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.  In July 2016, former Vice President Joe Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

22.     To revoke federal funds – the ultimate penalty – is a powerful tool because institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

23.     The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female

student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014. g.

24.     In response to pressure from OCR, DOJ, and the Obama Administration, educational institutions, like Defendant Tulane, have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

**B.     John Doe and Jane Doe Become Friends and Begin to Engage in Sexual Activity**

25.     John Doe grew up in Long Island, New York. In high school, he was a member of the Honor Society and the Student Government, wherein he served on the board as Treasurer during his Junior and Senior years. He excelled in his studies and had never faced accusations or adjudication of any misconduct, academic or otherwise.

26.     John Doe applied and was accepted to Tulane as part of the class of 2020. John Doe was awarded a $30,000 per year Premier Scholar academic scholarship. He commenced his education at Tulane in August 2016, at the age of seventeen.

27.     At Tulane, John Doe was a member of the Honors Program and was a pre-medical program and finance major.

28.     John Doe was introduced to fellow student, Jane Doe, during freshman orientation in August 2016. Several days after being introduced to Jane Doe, on or about August 30, 2016, John Doe was invited by his friend "M.M." to join him at the "Boot," a popular bar frequented by Tulane students. When John Doe arrived, he saw that M.M. was with Jane Doe and other Tulane students from M.M.'s dormitory. That night, Jane Doe spent most of her night with John Doe and M.M. Jane Doe and John Doe were drinking, but they were not intoxicated. Eventually, Jane Doe took John Doe's phone out of his hands and, in a flirtatious manner, refused to give it back to him. John Doe asked Jane Doe for his phone back, and eventually had to take it out of Jane Doe's back pocket, at which point Jane Doe stated, "I'm not done with you." Jane Doe eventually asked John Doe to walk her home that evening, and John Doe obliged.

29.     On their way to Jane Doe's dormitory, they passed by a set-up for the upcoming tailgate (an outdoor party to precede a sporting event) that was scheduled for the following day, because Jane Doe expressed an interest in seeing it. When they arrived, Jane Doe started to kiss John Doe. She intermittently initiated kissing, then pulled away and laughed, and then resumed kissing John Doe. She then grabbed John Doe's hand and started walking him towards her dormitory. When they arrived at her dorm, she told John Doe to sit on her bed.  He did so and then she began kissing him again. Jane Doe then undressed herself and removed John Doe's shirt. She then opened her closet door and retrieved a condom from the pocket of her jacket. She then walked back over to the bed and performed oral sex on John Doe before he had put on a condom. At no point did John Doe ask Jane Doe to perform oral sex or to engage in sexual activity of any kind. Jane Doe was the initiator and did not request verbal consent.  She also told

John Doe that she was on birth control. Jane Doe then put the condom on John Doe's penis. John Doe asked Jane Doe "What do you want me to do?" Her immediate response was "F**k me."[2]

30.     That evening, John Doe and Jane Doe engaged in consensual sexual intercourse multiple times between the hours of 1:00am and 4:00am. Afterwards, they talked for about an hour about their upbringings, studies, future plans, and the like. Jane Doe divulged to John Doe that she had a difficult family life and a bad relationship with her father, explaining that she had lived with her mother for some time without her father. She also told John Doe that she did a lot of hard drugs in Europe. (However, when John Doe was with Jane Doe the next day, John Doe asked Jane Doe what heroin had felt like, and Jane Doe responded that she had never done heroin and had lied to him about her time in Europe.)

31.     At around 5:00am on the morning of August 31, 2016, after John Doe and Jane Doe engaged in sexual intercourse and conversations, John Doe began to get out of bed. Jane Doe asked John Doe where he was going and he responded that he was going to leave. Jane Doe then asked him, "Don't you want to stay here tonight?" so John Doe got back into bed with Jane Doe and they fell asleep. John Doe then woke up at 7:30am and left to go to class. As John Doe was leaving, Jane Doe woke up and said goodbye.

32.     They soon began a brief sexual relationship, engaging in consensual sexual intercourse on multiple occasions. Each and every time John Doe slept with Jane Doe, John Doe asked her the same question: "What do you want me to do?" Each time, Jane Doe's answer was the same: "F**k me." John Doe asked Jane Doe that question for two reasons: (1) John Doe wanted to make sure that Jane Doe was not intoxicated on evenings where they had been drinking, and (2) John Doe wanted to know what Jane Doe liked and preferred sexually.

---

[2] Characters have been removed from expletive quotes throughout the Complaint.

33.     The next time John Doe saw Jane Doe was on or about September 2, 2016 on a riverboat cruise. In between August 30 and September 2, 2016, John Doe and Jane Doe exchanged text messages only once. Jane Doe texted John Doe on September 1 and asked him if he had her ID, to which John Doe responded "I don't think so, sorry." These text messages were documented. On the riverboat cruise, John Doe and Jane Doe did not spend much time together. They said "Hi" to each other in passing, but nothing more. After the cruise, John Doe went back to the Warren dormitory with his friends T.W. and J.R., and then the three of them went to the JL dormitory for a pregame, a gathering prior to attending a party. Jane Doe was there with a few friends. They did not speak much at the pregame.

34.     From the pregame, John Doe and his friends – including Jane Doe – went to a fraternity party at the Phi Gamma Delta house. John Doe spent much of the party with Jane Doe. For nearly the entire time they were at the party they were talking to friends N.A. and J.K. They then went to the Boot, where they spoke to classmate N.S. for about ten minutes. Jane Doe then asked John Doe to walk her back to her room. Jane Doe did not seem intoxicated. She was very energetic and flirtatious. They walked towards Jane Doe's dormitory.

35.     On the way to Jane Doe's dormitory, Jane Doe asked John Doe if they could go to John Doe's dormitory, but he told her that his roommate was sleeping so they could not enter his room. She then asked John Doe to see his phone. She texted her roommate from John Doe's phone saying, "[Roommate] this is [John Doe] I'm coming back to your room with [Jane Doe]." The text was neither written nor sent by John Doe, but by Jane Doe.  Jane Doe's roommate said okay, and Jane Doe and John Doe went back to Jane Doe's room.

36.     Again, Jane Doe undressed herself, told John Doe to get on her bed, retrieved a condom, and took John Doe's clothes off. John Doe and Jane Doe engaged in consensual sexual

intercourse from approximately 1:30 a.m. to 4:15 a.m. Again, before engaging in any type of sexual act, John Doe said "What do you want?" to which Jane Doe responded, "F**k me." John Doe and Jane Doe both fell asleep after. Jane Doe woke John Doe up at 7:00am because Tulane was doing a school-sponsored community service program. Jane Doe wanted John Doe to wake up early so that they could engage in sexual intercourse in the shower before going to the community service event. John Doe and Jane Doe, upon Jane Doe's suggestion, engaged in sexual intercourse in the shower. They then got dressed and went to the community service event.

37.    At the event, John Doe and Jane Doe got separated in line and ended up doing different community service programs. While doing community service, Jane Doe texted John Doe at 11:10 a.m. saying, "We should have stayed in bed. I'm passing out flyers and it's 300 degrees out." John Doe did not respond to her. Jane Doe then texted him again at 4:50pm saying, "Do you want to come over again tonight? My roommate isn't going to be here." Again, John Doe did not respond.

38.    That night, September 3, 2016, John Doe went to the Boot with some friends. John Doe was drinking, but was not incapacitated or heavily intoxicated. John Doe texted Jane Doe at 2:00 a.m. saying, "Where are you?" Jane Doe responded the following morning, September 4, 2016 at 11:07 a.m., writing "In bed hah." John Doe did not respond. Jane Doe again texted John Doe at 12:38 p.m., writing "I want to have sex." John Doe did not respond. At 3:07 p.m., Jane Doe texted John Doe again, writing "Come to sig ep[3]." John Doe did not respond. At 7:37 p.m., John Doe texted Jane Doe, asking "Where are you now?" Jane Doe texted John Doe back to explain she was at the JL dormitory. John Doe did not respond. Jane

---

[3] "Sig Ep" is a shortened term for fraternity Sigma Phi Epsilon.

Doe then texted John Doe again at 10:49 p.m., writing "I'm with your friend [friend's name] haha." John Doe again did not respond.

39.     Later that night at 12:12 a.m., Jane Doe again texted John Doe, stating "Hey I'm sorry but is there any way you could walk me home soon? I smoked too much and I feel super paranoid bc I never smoke. If you're busy its fine." John Doe asked Jane Doe if she was at the Boot. She sent John Doe her location and John Doe texted her back with "I'm inside the boot right now and really f**ked up." However, John Doe was not as intoxicated as he had indicated. He had consumed approximately two-to-three beers. He told Jane Doe he was intoxicated because he did not want to go get her, but he also did not want to be rude.

40.     Jane Doe texted John Doe back and wrote "Can you come here? It's right by the boot," adding "Okay if you can't its good." John Doe texted her back saying "I'm sorry I really would but I can barely walk back myself right now." John Doe never went to retrieve Jane Doe from her location, but Jane Doe eventually met John Doe at his location and they walked back to her room around 1:30 a.m.

41.     Once John Doe and Jane Doe were in Jane Doe's room, they followed the same pattern as their previous sexual encounters. Jane Doe told John Doe to go sit on her bed, and Jane Doe grabbed a condom from the jacket in her closet. Since she had told John Doe earlier in the evening that she was high and feeling paranoid, John Doe asked her, "Are you okay with this?" to which Jane Doe replied, "Yeah. Just f**k me." John Doe and Jane Doe engaged in sexual intercourse for approximately two or three hours.

42.     After sexual intercourse, John Doe said to Jane Doe "You know you can have sex with other guys, right?" John Doe wanted to make it clear to Jane Doe that he did not intend for their sexual relationship to be monogamous or serious and did not want Jane Doe to get the

wrong idea. John Doe had come to realize in the brief time he had known Jane Doe that they were incompatible. John Doe felt that Jane Doe perceived situations differently than he or others perceived them. For instance, she made claims that John Doe was stalking her, which John Doe felt were factually untrue. She would also lie frequently and make up stories, such as her claims of previous drug use. From the time John Doe met Jane Doe, she texted him every night that she went out, so John Doe wanted to make it clear that they were not dating and that they were not together as a couple.  Jane Doe responded saying, "Yeah I know." Shortly thereafter, John Doe got out of bed and put his clothing back on. Jane Doe asked John Doe where he was going, and John Doe explained that he wanted to sleep in his own bed that night. Jane Doe said "Okay" and John Doe left her room.

43.     After that night, John Doe and Jane Doe had no contact with one another for a week. They did not exchange text messages and they did not see each other in person, until a week later when they ran into each other at the Boot. John Doe walked past Jane Doe and interrupted her conversation with another man in order to said "Hi," to which Jane Doe responded "Ok [John Doe], I'm busy, move along now, f**k off." John Doe kept walking and did not say anything. That was the last time he had any contact with Jane Doe whatsoever.

**C.    John Doe Is Informed Of Jane Doe's Allegations Against Him Almost Two Months After Jane Doe Files Her Complaint**

44.     Upon information and belief, on or about October 6, 2016, Jane Doe made a report to Nataliya Uhrynchuk, Resident Advisor in Wall Residential College, alleging that John Doe had engaged in nonconsensual sexual activity with her on September 4, 2016 and had been stalking Jane Doe since that date.

45.     Upon information and belief, on or about October 6, 2016, Resident Advisor Uhrynchuk submitted an Incident Report on behalf of Jane Doe.

46. Upon information and belief, on October 7, 2016, Jane Doe met with Catherine Yockey Tyner, Director of Case Management and Victim Support Services, and repeated her allegations that John Doe had sexually assaulted and stalked Jane Doe. Upon information and belief, Jane Doe requested a No-Contact Order be issued between herself and John Doe. Jane Doe further requested to meet with Vanessa Rodriguez, Director of the Office of Student Conduct, in order to gain information regarding the conduct process.

47. Upon information and belief, Ms. Tyner provided Jane Doe with on and off-campus support resources and offered to set up a meeting between Jane Doe and the Office of Student Conduct ("OSC") to discuss possible participation in the conduct process.

48. John Doe received a call from Defendant Broussard on October 7, 2016, explaining to John Doe that Jane Doe had requested a No-Contact Order against John Doe. John Doe was given no further information regarding allegations, an investigation, or potential charges. John Doe was very confused when he got that call, but he had no intention of having contact with Jane Doe anyway, so he simply took this related information as being the end of the matter. He was unaware that allegations, an investigation, and charges were being pursued against him over the next month and a half without his participation or knowledge.

49. Upon information and belief, on or about October 20, 2016, Vanessa Rodriguez, Director of the Office of Student Conduct, met with Jane Doe to discuss her options within the Student Conduct Process. Jane Doe expressed a desire to move forward with the conduct process, and the case was assigned to Dawn Broussard, the OSC's Assistance Director and Investigator, for investigation.

50. Upon information and belief, Defendant Broussard met with Jane Doe to take her statement on or about October 27, 2016.

51.     Upon information and belief, Jane Doe claimed to have been hallucinating the entire night of September 4, 2016. However, Jane Doe later claimed that the hallucinations did not impact her mental abilities or memory, while also claiming the hallucinations impaired her ability to say "no" or express her disinterest in sexual activity on the night of the alleged incident. These statements and inconsistencies by Jane Doe were not addressed by Defendants during the adjudication process.

52.     Upon information and belief, Defendant Broussard met with witness "S.N." to take her statement on or about November 3, 2016.

53.     Upon information and belief, Defendant Broussard met with witness "S.M." to take her statement on or about November 4, 2016.

54.     Upon information and belief, Defendant Broussard met with witnesses "S.H." and "L.B." to take their statements on or about November 8, 2016.

55.     Upon information and belief, all of Jane Doe's witnesses admitted to being intoxicated during the night of the alleged incident, explaining to Defendant Broussard that their intoxication affected their recollection of the night. However, this information was later ignored by Defendants during the adjudication process.

56.     On or about November 8, 2016, Defendant Broussard sent Jane Doe her statement in written form for review, along with a list of follow-up questions. Jane Doe responded with changes and additional information. Defendant Broussard made the requested changes to the statement.

57.     Upon information and belief, Defendant Broussard met with witness "E.C." to take her statement on or about November 9, 2016.

58. Upon information and belief, Defendant Broussard sent witnesses S.N., S.M., and S.H. their statements in written form for their review on or about November 9, 2016. That same day, Defendant Broussard received a response from witness S.H. with suggested changes to her statement. Defendant Broussard made the requested changes to the statement.

59. Upon information and belief, Defendant Broussard scheduled a meeting with witness "G.E." to take her statement on or about November 10, 2016. However, witness G.E. failed to attend the meeting and did not respond to Defendant Broussard's email requesting a rescheduled meeting.

60. Upon information and belief, Defendant Broussard received a response from S.N. on or about November 11, 2016 with proposed changes to her written statement. Defendant Broussard made the requested changes to the statement.

61. Upon information and belief, Defendant Broussard sent witness E.C. her statement in written form for their review on or about November 15, 2016. That same day, Defendant Broussard received a response from witness E.C. approving the statement.

62. Upon information and belief, Defendant Broussard sent Jane Doe a list of follow-up questions on November 15, 2016, to which Jane Doe responded with additional information for her statement.

63. On or about November 22, 2016, almost two months after Jane Doe initiated her complaint against John Doe, and several weeks after Defendants initiated their investigation and communicated extensively with witnesses, John Doe finally received a letter informing him that he was being charged with violations of sexual assault, in violation of Tulane's Student Code of Conduct Policy (the "Policy"). There was no mention of who made the allegations or what was specifically alleged.

64.     Defendants charged John Doe with violations of sexual assault before even speaking to him or obtaining his statement, and before giving John Doe an opportunity to present his own facts or witnesses.

65.     Defendants interviewed and gathered statements from Jane Doe on multiple occasions and interviewed five (5) witnesses prior to giving John Doe notice of the charge against him.

66.     It was not until almost one week later, on or about November 28, 2016 that John Doe was given the opportunity to speak with anyone regarding the allegations, when John Doe received an email from Defendant Broussard, requiring him to attend a meeting "to interview [him] for [his] statement." In this email, there was no mention of the charges against him, the violations under consideration, the nature of the allegations, or who made the allegations. John Doe remained unaware of any facts necessary to give a statement regarding the charges of sexual assault, nor was he provided information regarding an agenda for the meeting or whether he could bring evidence or a list of witnesses. The only directive for the meeting, as stated in the November 28th email was that it would be regarding "a case you are involved in."

67.     Additionally, John Doe was not called to the meeting until almost three (3) months after the alleged incident, and therefore disadvantaged John Doe, asking him to recall events with credibility much later than Jane Doe's interview only several weeks after the alleged incident.

68.     Nevertheless, John Doe attended the meeting with Defendant Rodriguez the very next day, November 29, 2016, for a "Procedural Review."

69.     On or about December 6, 2016, Defendant Broussard met with John Doe and finally took his statement, exactly two months after the Incident Report based on when Jane

Doe's allegations were submitted, and a full three months after the alleged incident. During the December 6th meeting, John Doe provided Defendant Broussard with text messages exchanged between John Doe and Jane Doe the day prior to and the day of the alleged incident.

70.     Upon information and belief, between December 8 and December 9, 2016, Defendant Broussard met with witnesses "T.D.," "A.M.," "M.M.," and "E.C.2," in order to take their statements.

71.     On or about December 16, 2016, Defendant Broussard sent John Doe his statement for review and on or about December 19, 2016, Defendant Broussard sent John Doe a list of follow-up questions, to which John Doe responded and provided additional information to be added to his statement.

72.     Almost three weeks later, on or about January 3, 2017, Defendant Broussard sent John Doe his statement for further review along with follow-up questions. Defendant Broussard also sent John Doe a request for him to resend screen shots of the text messages he'd previously provided. On or about January 5, 2017, John Doe provided Defendant Broussard with responses to her follow-up questions and screen shots of the text messages as requested. Upon information and belief, Defendant Broussard did not request screen shots of text messages from Jane Doe. Jane Doe was not required to provide screen shots of text messages until the eventual hearing, at which time she was not required to provide the entire text message exchange, but rather only a partial snippet of her communications with a friend.

73.     On or about January 25, 2017, John Doe met with Defendant Broussard to review his statement, at which time suggested changes were implemented in the statement. On or about February 6, 2017, John Doe sent a supplemental written statement to Defendant Broussard.

74.     On or about the evening of February 9, 2017, Defendant Broussard sent John Doe a Hearing Board Packet which contained the Investigation Report. In the Investigation Report, key names and material information had been redacted, preventing John Doe from fully understanding the allegations against him. On or about February 13, 2017, John Doe met with Defendant Broussard to ask about protocol for the hearing and witnesses who would be appearing. This is the first time he received the information missing from his Hearing Board Packet, specifically the information necessary to defend himself. However, since John Doe's hearing (the "Hearing") was scheduled for February 15, 2017, he did not receive the 48 hours to review this information, as prescribed by Tulane's Policy.

75.     On February 13, 2016, John Doe met with Defendant Broussard to discuss confidentiality breaches, namely that Jane Doe had retaliated against John Doe by discussing witness statements with others and widely accusing John Doe of having "raped her."  John Doe provided Defendant Broussard with a list of names of the individuals who had confronted him about the "rape charge". Defendant Broussard stated that Jane Doe's actions were not necessarily retaliation and that "it was not against the code to talk about something."  Defendant Broussard's response was in direct violation of the Students Rights provided to John Doe by the Office of Student Conduct which stated that, "A student charged with a violation of the Code of Student Conduct is entitled to procedural protections under the Code, including the right (21.) to receive reasonable protection from retaliation, intimidation, harassment or malicious prosecution."

76.     John Doe arrived for his scheduled Hearing on February 15, 2017, as instructed. He arrived promptly with his advisor and his parents, who had traveled from New York to Louisiana for the Hearing. John Doe was anxious to finally address a hearing panel, more than six months after Jane Doe had made her allegations against John Doe.

77.     However, after waiting for the hearing to begin, John Doe was informed by Defendant Rodriguez that the hearing would be postponed. The reason for the postponement, as communicated to John Doe, was that a member of the Hearing Board was unable to attend on that day. However, when the Hearing eventually took place, one month later on March 15, 2017, the sophomore student on the Hearing Board had been replaced with one of the top graduate students from the University's law school. It was perplexing, therefore, that a month delay was caused by the previous unavailability of one of the Hearing Board panelists.

78.     On Friday, March 10, 2017, a polygraph test that had been performed on John Doe by an independent third party was confirmed to have been received by Ms. Rodriguez. Ms. Rodriguez had advised John Doe that if he would like the information submitted for inclusion in the Hearing Board Packet, to let Ms. Rodriguez know as soon as possible. John Doe responded that same day that he would indeed like the polygraph included in the Hearing Board packet. The polygraph confirmed that John Doe was telling the truth about having mutual consent with Jane Doe throughout the entirety of their sexual activity. Notwithstanding John Doe's prompt affirmative response when asked if he wanted the polygraph results included in the hearing packet, the polygraph report was not included in the final hearing packet presented to the Hearing Board.

79.     During the time between the originally scheduled date of the Hearing, February 15th, to the new date of the Hearing, March 15th, Defendants compiled a new hearing packet. However, John Doe was not provided with a copy of the new hearing packet prior to his Hearing on March 15th. It was only after John Doe arrived at the Hearing that he was given the new hearing packet, within which additional information had been added by Defendants.

80.     Defendants never informed John Doe that he and Jane Doe were allowed to add additional information to the hearing packet. In fact, John Doe was never informed that Jane Doe had added additional information to the hearing packet, until John Doe was provided the updated hearing packet at the hearing.

81.     John Doe quickly noticed that the hearing packet contained newly added information John Doe had never been presented with before, and that the additional evidence John Doe submitted – the polygraph report he had sent to Ms. Rodriguez per her instructions and which he was assured would be included in the packet – was actually excluded from the new hearing packet.

82.     John Doe was deprived an opportunity to review and prepare a response to the new information included in the hearing packet. Defendants had accepted new information which was not disclosed to John Doe until after the Hearing began and had a likely probability of impacting the outcome of the Hearing. The new information provided by Jane Doe was incomplete and unsubstantiated.

83.     On March 15, 2017 the rescheduled hearing was held before three hearing board panel members: a faculty member, a staff member, and a student. The faculty member was Dennis Kehoe, a subcommittee co-chair for the Sexual Violence Prevention & Education Coalition (SVPEC) which served as an interdisciplinary team of Tulane University senior-level administrators, faculty, staff and students to address the problem of sexual violence and misconduct among the student population. John Doe was never informed of Mr. Kehoe's background, nor was John Doe presented with Mr. Kehoe's biography. If John Doe had known of John Doe's position in SVPEC, John Doe would have objected to Mr. Kehoe's involvement in the hearing board panel due to Mr. Kehoe's bias.

84.     The new student hearing panel member, who replaced the sophomore from the previously scheduled hearing, was a top-ranked graduate student from the law school.

85.     On March 24, 2017, John Doe received a letter from Ms. Rodriguez, informing him that the findings had been issued that he had been found responsible for violating code section 1.III. E. 2.b - Sexual Assault (the "Decision"). The March 24th letter also detailed the numerous sanctions imposed on John Doe, including suspension through Fall 2017, followed by probation through the end of Fall 2018. During this time, John Doe was prohibited from participating in a study abroad program, joining a fraternity, or holding an office for a university organization, and was required to attend "consent" training and bear the burden of the No-Contact Order, including being barred from any building or dormitory wherein Jane Doe takes classes or resides (the "Sanctions").

86.     However, the March 24th letter was devoid of any explanation regarding the Decision, the basis for the Decision, the facts taken into account, or any meaningful information to support the Sanctions being imposed on John Doe.

87.     Included with March 24th letter were two other letters: one from Title IX Coordinator, Meredith M. Smith, and Vice President for Student Affairs, Dusty Porter. Ms. Smith's letter began by referring to her receipt of the "Decision of the Hearing Board Letter" (the "Decision Letter"), upon which she was basing her decision regarding Sanctions. In explaining the rationale for John Doe's increased sanctions, Ms. Smith claimed that because all other sexual assault decisions at Tulane had resulted in at least a suspension, John Doe's sanctions required at least a suspension as well. Ms. Smith failed to mention any specific details, facts, or information relevant to John Doe's case or hearing that reasoned the heightened Sanctions.

88.     However, John Doe had not himself received the Decision Letter, which had apparently become available to others before being sent to John Doe. In fact, John Doe, prompted by Ms. Smith's letter, had to take the initiative to request the Decision Letter, and was then told that it would take several days to redact, after which point he could be provided with a copy.

89.     It was not until the evening of March 27, 2017 that John Doe received the Decision Letter containing the Hearing Board rationale. Inexplicably, the Letter was not dated nor signed.

90.     After reviewing the Decision Letter, it was clear to John Doe that there were procedural errors committed in reaching the decision. Namely, there was a material procedural error in the failure to apply the preponderance of the evidence standard to the evidence regarding whether Jane Doe affirmatively withdrew consent for sexual intercourse. Other than Jane Doe's statement of alleged facts, no evidence was produced to support Jane Doe's contention that she revoked consent at any time during John Doe and Jane Doe's sexual relationship.

91.     Furthermore, the Hearing Board never questioned the many inconsistencies in Jane Doe's statements to Defendant Broussard. For example, Jane Doe said she doesn't always "tap" into her dorm room.[4] John Doe stated the same thing; however, this statement was used against him when he said that he didn't tap into the Butler dormitory at 4:00am on the morning of the alleged incident. Jane Doe's roommate had stated that Jane Doe was back in her room on the morning of September 5, 2016 by 11:00am and that John Doe was not there. Nonetheless, John Doe's timeline was not considered credible.

---

[4] Tulane's dormitory rooms are locked in a "keyless" manner, so a student who wishes to enter a room must "tap" a card on a reader installed on the door to the room.

92.     As John Doe further testified, approximately one week after the alleged incident, John Doe saw Jane Doe at the Boot. Jane Doe was talking to a man, and when John Doe passed her, she playfully told John Doe to "move along," while shoo-ing him jokingly with her hands. Jane Doe had not acted upset nor appeared uncomfortable in seeing John Doe.

93.     Given the many inconsistencies in Jane Doe's testimony, for the Hearing Board to find John Doe "Responsible" indicated a failure to accurately apply the preponderance of the evidence standard in assessing the facts as presented, and only accepting as true the information communicated by Jane Doe. In reaching its conclusion, the Hearing Board ignored the exculpatory evidence provided by John Doe and by Jane Doe's own roommate.

94.     Furthermore, in reaching their erroneous Decision, the Hearing Board improperly placed the burden to obtain consent on John Doe, as the male accused. The Hearing Board's rationale for its Decision made no assessment of John Doe's ability to consent to the sexual activities that took place on the night of the alleged incident, despite John Doe's testimony that Jane Doe had initiated the sexual activity that evening. Despite Jane Doe's initiation of sexual activity, she did not discern John Doe's own level of incapacitation and whether he was capable of providing consent for sexual intercourse. Nevertheless, this issue was not questioned, probed, or considered by the Defendants throughout the investigation and hearing process.

95.     In addition, the Sanctions imposed on John Doe were explained to have been altered and increased prior to being communicated to John Doe. The Hearing Board had originally recommended one semester of disciplinary probation.  The Hearing Board submitted by the panel stated that "The Board was unanimous in these recommendations. In deliberating the above sanctions, the Board first determined that they do not believe that [respondent] is a continued risk to [complainant] or to the Tulane community."  Furthermore, the Hearing Board

stated, "the Board focused more upon sanctions which they felt provided him continued educational opportunities."

96.     The arbitrary and disproportionate increase in the severity of the sanctions was unjustified. During the nearly seven (7) months of investigation and adjudication of the allegations against John Doe, at no time did Defendants impose an interim suspension or other restrictions against John Doe, because John Doe was not deemed a threat to others, nor had he created a hostile environment at the University, as stated by the Hearing Board.

97.     However, in the letter from Defendant Smith attached to the March 24th letter John Doe received, Defendant Smith wrote that she could not support the Hearing Board's decision to impose a sanction of probation because it was not "congruent with [their] Title IX efforts." Defendant Smith therefore recommended that the Sanction be increased to a separation of suspension because "all cases of this nature have resulted in suspension or expulsion." Absent from Defendant Smith's analysis of John Doe's case was the information communicated by the parties and witnesses, the evidence presented, or any details of the case. It was a blanket decision, lacking basis and rationale.

98.     Distressingly, Defendant Smith started her letter, which was dated March 23, 2016, by stating, "This morning, I received the Decision of the Hearing Board Letter regarding [John Doe's] March 15, 2017 student conduct hearing." Ms. Smith's receipt of the Decision Letter that morning calls into question her ability to review the hundreds of pages of documents included in John Doe's case file, in order to make such an important decision with severe and potentially devastating results for John Doe's future.

99.     Similarly, on that same day, March 23, 2017, Defendant Porter received Defendant Smith's letter and issued his own letter in agreement with Defendant Smith to

arbitrarily increase the Sanction from probation to suspension. Defendant Porter's ability to review John Doe's entire case file in such a short time-span in order to issue his decision to increase the Sanction is also questionable.

100.    It therefore stands to reason that the decision to increase the Sanction was reached arbitrarily, and the Defendants all merely rubber-stamped the predetermined, arbitrary and capricious Decision that John Doe was responsible, and then confirmed the disproportionate sanctions because it was congruent with the University's new paradigm, influenced greatly by the 2011 Dear Colleague Letter and pressures by the OCR.

101.    Similarly, John Doe's appeal, in which he laid out numerous grounds for appealing the Decision, simply resulted in further rubber-stamping of the Decision by the Defendants.

102.    John Doe submitted his appeal to the Decision on or about April 4, 2017 (the "Appeal"). The Appeal was based on the following grounds: (1) procedural errors occurred that were so substantial that John Doe was denied the right to a fair hearing; (2) the finding of responsibility was arbitrary and capricious; and (3) the sanctions imposed were disproportionate to the offense.

103.    On May 1, 2017, an appeal hearing was held (the "Appeal Hearing"). However, John Doe was not informed that an Appeal Hearing had taken place, who was on the Appeals Hearing panel, or why John Doe's Appeal was rejected.  On May 3, 2017, a letter from Defendant Rodriguez was sent to John Doe stating John Doe's appeal had been denied, confirming Defendants' original Decision. Absolutely no basis or rationale for the appeal decision was provided.

104.    An unsubstantiated anonymous complaint against John Doe for "arson" was filed in February 2017. This anonymous and baseless complaint resulted in charges that John Doe had violated the Policy section III.D.9- Initiating or causing to be initiated a fire, explosion, or other emergency on or about February 17, 2017.

105.    John Doe was shocked to learn that a complaint had been made against him for the very serious charges of "initiating or causing to be initiated a fire, explosion, or other emergency."  John Doe does not smoke and had never started a fire indoors in a campus residence. On the date of the alleged incident, John Doe was only in his dormitory briefly to drop off his laptop and had later come back to his room to shower and change before meeting up with friends. While back in his dormitory to get ready, he did not see anyone he knew, nor was his roommate in the room at that point. At approximately 8:05 pm, after showering and getting dressed for the night, John Doe decided to head out towards Monroe Hall. He spent the evening with friends E.C. and J.G.  Together, they went to the Little Tokyo sushi bar before eventually heading back to the Boot. At no point when he was back in his dormitory did he smell smoke or see a fire. It was not until his Resident Advisor tried to contact him several days later that he was made aware that someone had alleged the smell of smoke coming from the room he shared with his roommate.

106.    In early April 2017, John Doe received a phone call from Jessica Mullaly, ("Ms. Mullaly"), an Investigator in the Office of Student Conduct, requesting to meet with John Doe. John Doe was not informed about the reason for the meeting. On April 10, 2017, in an email to John Doe, Ms. Mullaly stated she wanted to schedule an interview with John Doe "regarding the open conduct charges."  This was the entirety of the information that John Doe received. There were no charges included in the Investigator's email, no mention of what the conduct charges or

allegations were, who the complainant was, or what violations were under consideration due to the allegations.  The directive for the meeting only mentioned "regarding open conduct charges."

107.    According to the Policy, "The Student Conduct Administrator or designated representative will notify the student alleged to have engaged in prohibited conduct in writing of the charges and will inform the responding student of their rights."  Critically, John Doe received no notice of the charges nor any notice of his rights as a respondent regarding the allegations.

108.    Moreover, the email did not mention that John Doe could bring an advisor to this required meeting. John Doe was informed that he was required to attend a meeting but was not informed of the agenda, how to prepare, or that he could bring evidence or a list of witnesses. The notification that John Doe received from the University was vague and did not provide any details for John Doe to determine what specific allegations, in order to respond or prepare a defense to these false allegations.

109.    The Policy specifically stated, "In all cases, responding students or groups may elect to proceed through an informal process or to request that the matter proceed through the formal process."  However, in John Doe's case, he was not provided the opportunity to elect the process for resolution of his case. On May 10, 2017, John Doe received an email from Ms. Mullaly stating:

> Because the Office of Student Conduct has determined that suspension and/or expulsion would be inappropriate sanctions given your current charges, we have decided to proceed through the underline informal process. Therefore, you will have an Administrative Hearing.  Please let me know your availability so we can set up a convenient time for the hearing to take place. (emphasis added)

110.    Despite the Policy directing that a student such as John Doe could elect the process for his case, it had been determined by the Investigator that John Doe would proceed through the informal process. However, the Policy also stated that, "The informal process

includes resolution through a Restorative Resolution Process, Mediation, or Pre-Hearing Conference." Notably, the Policy did not state that an informal resolution included an Administrative Hearing. The Policy stated, "The underline formal resolution process includes resolution through an Administrative Hearing or the Hearing Board." Furthermore, the Policy stated, "At the Vice President for Student Affairs' discretion and if the responding student and complainant consent, that case may be heard through an Administrative Hearing." (emphasis added). John Doe was not consulted nor did he originally consent to an Administrative Hearing.

111.    Tulane utilizes the inherently biased single investigator model which resulted in a further procedural violation. This model affords one individual, in this case Ms. Mullaly, to conduct the entire investigation, draw conclusions of fact and issue a finding of responsibility. Given the lack of a formal hearing procedure, Ms. Mullaly was granted the discretion to decide the relevance of all evidence, determine what evidence to include or exclude from the final investigation report and make assessments of credibility, without being subjected to review by an impartial hearing panel. Without any method for checks and balances of the investigation process, Ms. Mullaly was able to conduct the investigation in a manner that led to a predetermined outcome. Thus, the failure to offer John Doe the opportunity to present his case before an objective and neutral hearing panel further deprived him of his procedural rights to a fair process.

112.    The failure to afford John Doe a full hearing, on charges as serious as initiating a fire, was a severe violation of his procedural rights as it deprived him of a meaningful opportunity to be heard. Not only was John Doe deprived of the opportunity to confront and question his accuser, but he was also deprived of the ability to be heard before an impartial tribunal, in violation of his procedural rights to due process. Given the severity of potential

sanctions and the significant impact that a finding of responsibility would likely have on his education and future career, John Doe should have been afforded a full hearing consisting of an independent panel, cross-examination of all witnesses and the right to confront and question his accuser.

113.    On May 15, 2017, Ms. Mullaly first offered John Doe a deal whereby he agreed to a plea deal, in exchange for Ms. Mullaly dropping the charges for initiating a fire and change the charge to disorderly conduct:

> I am writing this letter as a follow-up to your Administrative Hearing held on May 15, 2017. As per your request we are amending your charges from III.D.9- Initiating or causing to be initiated a fire, explosion, or other emergency, to III.D.21- Abusive, disruptive, or disorderly conduct. If you agree to the amendment, and agree to forego the requirement set forth in the Tulane Code of Student Conduct that you receive notice of the charges three days prior to the Administrative Hearing, then you will be found responsible for abusive, disruptive, disorderly conduct and the following sanctions will be imposed."

114.    The proposed arson sanctions were the same sanctions John Doe received in the final outcome letter: expulsion from campus housing and deferred suspension.

115.    The deal offered by Ms. Mullaly was simply stated as "Accept the charges of abusive behavior and agree to live off campus, and we will drop the arson charges and nothing will be placed on your record."

116.    It was evident that the charges had been arbitrarily changed and increased because John Doe stated that he was not responsible, and that he wanted a formal Administrative Hearing. Significantly, John Doe was not provided with any witness statements or evidence to suggest his responsibility. Instead, the University improperly placed the burden of proof on John Doe to establish that the allegations were false, rather than placing the burden of proof on the University to establish that John Doe was in fact responsible. In doing so, John Doe was denied

fundamental fairness in the proceedings which consequently evidenced a bias against him as the accused, being presumed guilty from the outset.

117.    On or about July 7, 2017, John Doe attended a hearing, wherein Melanie Johnson ("Ms. Johnson"), Associate Director of Multicultural Affairs, was the sole adjudicator.

118.    On or about July 18, 2017, John Doe received a letter from Ms. Johnson, informing him that he had been found "Responsible" of two offenses: (1) Abusive, disruptive, or disorderly conduct, and (2) Initiating or causing to be initiated a fire, explosion, or other emergency (the "Arson Decision"). The letter further communicated that John Doe was to be removed from housing effective July 7, 2017 and would not be able to reside in residence halls during his tenure at Tulane. John Doe was also to be placed on Deferred Suspension from December 21, 2017 through May 31, 2018 (the "Arson Sanctions").

119.    John Doe had never been notified of an additional charge of "Abusive, disruptive, or disorderly conduct" until he was found Responsible of the charge. John Doe had previously only been made aware of the possibility of that charge as an option through a plea deal.

120.    On or about July 28, 2017, John Doe submitted an appeal of the Arson Decision and Arson Sanctions, wherein he described the procedural errors employed by Defendants and the disproportionate sanctions Defendants imposed on John Doe. John Doe's appeal was denied, without any detailed explanation for the denial.

121.    Due to Defendant's actions with regard to the foregoing, John Doe has been diagnosed with Depression and Post Traumatic Stress Disorder. John Doe has attended counseling to address the anxiety and depression he has endured as a result of allegations and proceedings he faced between October 2016 and July 2017. John Doe has also had to deal with

the negative impact Defendants' actions have had on his academics, in addition to the stress and financial impact it has had on his family.

## COUNT I
### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process
### (Against Defendant Tulane)

122.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

123.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case, Defendants are state actors subject to the Fourteenth Amendment.

124.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

125.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

126.    On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

127.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin

investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

128.    For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

(i)     Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

(ii)    Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(iii)   Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(iv)    Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

(v)     Required not to allow cross-examination by the accused student;

(vi)    Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

129.    Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, former DOE Assistant Secretary for Civil Rights, Catherine Lhamon, stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

130.    Upon information and belief, since 2011, Tulane has acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to crippling monetary penalties. Therefore, Tulane has a pecuniary interest in the outcome of the adjudication of sexual assault complaints, because it could lose federal money

35

if it finds the respondent "Not Responsible." Tulane does not face the same risk of pecuniary loss if it finds the respondent "Responsible." Therefore, Tulane became a state actor by virtue of the federal government's coercion to comply with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

131.    The Dear Colleague Letter has resulted in significant action and legal consequences.  Former Assistant Secretary for the Office for Civil Rights Catherine Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

132.    Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX.  She went on to describe that enforcement mechanism as part of a set of "very, very effective tools."  Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

133.    In fact, former Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government."  Concerning why there is a higher volume of complaints being made to the OCR, Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." http://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained

134.    On September 7, 2017 Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both

victims and the accused. Ms. DeVos stated that "one person denied due process is one too many."

135.    The failure of educational institutions to provide fair and impartial policies and procedures led Ms. DeVos to declare that "the current approach isn't working. Washington has burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate. Where does that leave institutions, which are forced to be judge and jury?"  Moreover, Ms. DeVos stated, "It's no wonder so many call these proceedings "kangaroo courts. Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

136.    Regarding pressure from Office for Civil Rights on institutions to adhere to "the failed system imposed policy by political letter," Ms. DeVos stated, "No school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington."

137.    Significantly, Ms. DeVos proclaimed that the "era of 'rule by the letter' is over." The 2011 Dear Colleague Letter has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined."  Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination."

138.    "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," Ms. DeVos stated.

139.    On September 22, 2017, the OCR withdrew the April 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

140.   The OCR noted that the April 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and ***are in no way required by Title IX law or regulation***.'" *Id.* (citation omitted) (emphasis added). *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

141.   On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "September 2017 Guidance"). *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.   The September 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

142.   The Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX…be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation; and (v) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation. *See id.*

143.   However, on October 2, 2017, Tulane issued a statement to its students, staff, faculty, and administrators. In the statement, Tania Tetlow, Senior VP & Chief of Staff to the President, along with Defendant Smith, referred to the University's "concerns" regarding the

DOE's "new guidance on campus sexual assault" and announced the University's commitment to the original 2011 Dear Colleague Letter:

> As we talk about our work on campus, it's important to spend a moment reflecting on our collective concerns regarding the U.S. Department of Education's new guidance on campus sexual assault. As President Fitts made clear at Shifting the Paradigm, Tulane remains committed to our current Title IX policies and procedures. We are equally committed to the progress that we've made together as a result of our response to the 2011 Dear Colleague Letter, which addressed the issue of sexual assault on college campuses. As President Fitts said at Shifting the Paradigm, "This problem will never again be brushed under the rug. Eyes have been permanently opened, and there is nothing that will ever change that."

144.   Tulane's procedures for adjudicating sexual misconduct complaints is precisely the type of system referenced in DeVos' statement and in the September 22, 2017 Dear Colleague Letter.

145.   Tulane applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the sexual assault complaints against John Doe.

146.   Accordingly, when Tulane investigated and adjudicated the sexual misconduct complaints against John Doe, and imposed a sanction of suspension on John Doe upon reaching its conclusions, Tulane was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

147.   In the course of such investigation and adjudication, Tulane flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

148.   Defendant Tulane deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication; his

right to be informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to question his accuser; his right to challenge the credibility of any adverse witnesses; and his right to present evidence and witnesses in support of his defense.

149.    In the course of such investigation and adjudication, Defendants flagrantly violated John Doe's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by employing a Kafkaesque process in which there is no cross-examination, no sworn testimony, a sanction hearing is held after a single investigator has already determined responsibility, a respondent has no adequate ability to defend himself, there is no presumption of innocence but rather a presumption that the female's accusations are true, there is no reasoned consideration of evidence as required by a burden of proof, no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in discriminatory decision-making.

150.    Cross-examination has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997).  Yet, in a case where Tulane relied upon a credibility assessment determined by a single investigator, there was no hearing, no sworn testimony was taken and thus no cross-examination was available, in violation of due process of law.  *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

151.    As a result, Defendant Tulane failed to provide Plaintiff with the basic due process protections that they are required to provide to students accused of sexual misconduct, in violation of the 14th Amendment.

152.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

153.    Accordingly, Defendant Tulane is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

154.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

155.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**(Violation of Title IX of the Education Amendments of 1972 Against All Defendants)**

156.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

157.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

158.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

159.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

160.    The Obama Administration's DOE promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. Such prohibited actions include all forms of sexual misconduct.  34 C.F.R. § 106.8(b).

161.    Even the Obama Administration's DOE ostensibly recognized that the procedures adopted by a school such as Defendant Tulane covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

162.    The Obama Administration's DOE recognized that there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

163.    Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim generally asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

164.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault, and gender bias was a motivating factor.

165.    The denial of due process and the procedural errors made in this case resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts.

166.    Defendant Tulane failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation and hearing into Jane Doe's allegations, without John Doe's participation for almost two months.  The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe, depriving him of adequate notice and material information necessary to meaningfully participate in the adjudication process.  The investigators and adjudicator were further biased by the University's erroneous conclusion that John Doe had engaged in misconduct, despite a lack of evidence or witness testimony to support Jane Doe's claims.

167.    As stated above, cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997).  Yet, John Doe's proposed questions for Jane Doe and certain witnesses were limited and required approval by Defendants Broussard and Rodriguez, and many of John Doe's cross-examination questions were excluded from the Hearing, in violation of due process of law.  *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

168.    The totality of the circumstances establishes that Defendants acted out of gender bias in reaching the "erroneous outcome." Defendants did not weigh the evidence in John Doe's favor, or lack of evidence to support Jane Doe's allegations, when reaching their Decision. Furthermore, the Sanction imposed on John Doe was arbitrarily increased in severity, without

explanation or rationale, seemingly to present to the public a stricter approach to any situation wherein sexual assault allegation are involved.

169.    Upon information and belief, Defendants were pressured by activist groups that calling for harsher penalties for respondents in Title IX cases, and an increased scrutiny in cases such as John Doe's. The Obama Administration's Department of Education pressured colleges and universities into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter regardless of due process considerations.  Upon information and belief, Defendant Tulane's mishandling of John Doe's case was wrongfully affected by campus and federal pressure.

131.    The totality of circumstances establishes that Defendant Tulane has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

132.    Upon information and belief, all students that have been suspended or expelled from Defendant Tulane for sexual misconduct have been male.

133.    Male respondents in sexual misconduct cases at Defendant Tulane are discriminated against solely on the basis of sex.  They are usually found guilty, regardless of the evidence or lack thereof.

134.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, career opportunities, economic injuries and other direct and consequential damages.

135.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements,

and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT III
### (State Law Breach of Contract against Defendant Tulane)

136.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

137.   Defendant Tulane created express and/or implied contracts when John Doe accepted an offer of admission to Defendant Tulane and paid the tuition and fees.

138.   Defendant Tulane breached express and/or implied contracts with John Doe.

139.   Defendant Tulane's policies provide that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed.  Defendant Tulane breached its contract with John Doe when it failed to conduct a fair and impartial process, including not holding a hearing. While Tulane's "Hearing Board Process and Responding Student Rights" afford John Doe the right to have the complaint resolved without discrimination on account of their sex, Defendants nonetheless discriminated against John Doe because he was a male student. Thus, Defendants violated the contract with John Doe when they failed to afford him a non-discriminatory process and resolution.

140.   The U.S. Department of Education Office for Civil Rights requires that the preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students, Defendant Tulane purports to utilize this then-required standard of review, as recognized in its Policy. Defendant Tulane violated this provision and failed to correctly administer the standard when it improperly placed the burden of proof on John Doe to prove that the accusations against him

were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching the outcome.  Defendant Tulane therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

141.    Based on the aforementioned facts and circumstances, Defendant Tulane breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe.  Defendant Tulane failed its duty of good faith and fair dealing when it meted out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct.

142.    John Doe is entitled to recover damages for Defendant Tulane's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

143.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT IV
### (State Law Estoppel and Reliance against Defendant Tulane)

144.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

145.    Defendant Tulane's various policies constitute representations and promises that Defendant Tulane should have reasonably expected to induce action or forbearance by John Doe.

146.    Defendant Tulane expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant Tulane would not tolerate, and John Doe would not

suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Tulane policies.

147.    John Doe relied to his detriment on these express and implied promises and representations made by Defendant Tulane.

148.    Based on the foregoing, Defendant Tulane is liable to John Doe based on estoppel.

149.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

## COUNT V
### Negligent Infliction of Emotional Distress

150.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

151.    Tulane owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner. Tulane breached its duties owed to John Doe.

152.    Such breach by Tulane created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

153.    Tulane was informed that Jane Doe had retaliated against John Doe by discussing witness statements with others and accusing John Doe of having "raped" her. Despite the knowledge of Jane Doe's actions, Tulane failed to protect John Doe's right to confidentiality and privacy to as great a degree as is legally possible, as afforded to Tulane students – including

alleged offenders of misconduct – by its Policy. Instead, Defendant Broussard stated that Jane Doe's actions were not necessarily retaliation and that "it was not against the code to talk about something." Defendant Broussard's response was in direct violation of the Students Rights provided to John Doe by the Office of Student Conduct which stated that, "A student charged with a violation of the Code of Student Conduct is entitled to procedural protections under the Code, including the right (21.) to receive reasonable protection from retaliation, intimidation, harassment or malicious prosecution."

154.   As a direct and foreseeable consequence of Tulane's actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

155.   The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe. As a result of Defendants' actions, John Doe was diagnosed with Depression and Post Traumatic Stress Disorder.

156.   Tulane's extreme and outrageous conduct was the cause of John Doe's distress.

157.   Considering that John Doe's entire academic and future employment opportunities would suffer as a result of the adverse decision, Tulane should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

158.   John Doe's distress is reasonable in light of Tulane's conduct.

159.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational opportunities, economic injuries and other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against

Defendants as follows:

(i)　　on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements an injunction   enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints;

(ii)　　on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

(iii)　　on the third cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)　　on the fourth cause of action for state law breach estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)　　on the fifth cause of action for state law negligent infliction of emotional distress, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Dated: November 8, 2017

<div style="margin-left:auto;">

Respectfully Submitted,

*/s/ Ellie T. Schilling*

William P. Gibbens (27225)
Ellie T. Schilling (33358)
**Schnonekas, Evans, McGoey & McEachin, LLC**
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
504-680-6050
billy@semmlaw.com
ellie@semmlaw.com

-and-

Andrew T. Miltenberg, Esq. (*pro hac vice* forthcoming)
Diana R. Warshow, Esq. (*pro hac vice* forthcoming)
**Nesenoff & Miltenberg, LLP**
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500
amiltenberg@nmllplaw.com
dwarshow@nmllplaw.com

*Attorneys for Plaintiff John Doe*

</div>